28861. NICHOLS *v.* G. L. HIGHT MOTOR CO. *et al.*

DECIDED JUNE 21, 1941. REHEARING DENIED JULY 19, 1941.

*Maddox & Griffin,* for plaintiff.
*Matthews, Owens & Maddox,* for defendants.

SUTTON, J. Mrs. Mary Nichols filed suit against G. L. Hight

Motor Company and Herman Johnson for damages on account of the homicide of her son, Andrew J. Nichols, alleged to have been caused by the negligent operation of an automobile driven by Johnson while on business for the motor company, his alleged employer. On the trial of the case the court granted a nonsuit as to the defendant motor company, and in *Nichols* v. *G. L. Hight Motor Co.*, 63 *Ga. App.* 155 (10 S. E. 2d, 439), to which reference may be made for a full statement of the pleadings and the evidence, this court reversed the judgment of the trial court, holding that under the evidence it was a jury question whether or not Johnson was the servant of the automobile company and, if so, whether or not, at the time of the homicide, he was acting within the scope of his employment and performance of his duties as a salesman for the company. When the case again came on for trial the court, after the introduction of evidence, granted a nonsuit as to the motor company, and the exception here is to that judgment, the plaintiff in error contending that under the evidence the case should have been submitted to the jury.

It appeared from the evidence introduced on both trials that Herman Johnson was engaged in selling automobiles on commission for the G. L. Hight Motor Company in Rome, Georgia, and that while driving a coupé belonging to the company at about 6:45 o'clock on the night of February 3, 1939, in the City of Rome, he ran upon and killed the son of the plaintiff, who at the time was standing in the center of Broad Street at the rear of a truck which, while being driven by him, had broken down. Johnson had been endeavoring by personal calls, prior to February 3, 1939, to sell an automobile to R. R. Hardin, but no sale had been made, particularly because no agreement had been reached as to the amount to be allowed him on a car to be traded in. Hardin, who worked at Sterchi's in Rome, went to the premises of the motor company between 5 and 6 o'clock in the afternoon of February 3, 1939, and informed the general manager, Golden Stevens, that he wanted to see Herman Johnson, who had been trying to sell him an automobile. He was informed that Johnson was out, but Stevens appraised the car of Hardin. Johnson arrived a short while after Hardin's departure, and Stevens told him that Hardin had been in to see him and directed Johnson to get in touch with him. Johnson stated to Stevens that he would see Hardin after supper. The

homicide for which the present suit is brought occurred about 6:45 p. m., after Johnson had left the premises of the motor company, and other facts in connection therewith, as adduced on the last trial of the case, will be hereinafter shown.

In the statement of facts in the report of the first appearance of the case before this court it was recited: "There was testimony going to show that Johnson before going to Sterchi's to see Mr. Hardin had stopped at the Partridge Café, where his wife was employed, to eat supper. Sterchi's was located on the northwest corner of Fourth Avenue and Broad Street. The accident resulting in the death of the plaintiff's son occurred just north of Fourth Avenue towards Fifth Avenue on Broad Street. The Partridge Café was on Broad Street just north of Fifth Avenue towards Sixth Avenue. Under the ordinance of the City of Rome, if one is going north on Broad Street he can not make a U-turn to come down the other side of Broad Street until he comes to Sixth Avenue." In the opinion it was said: "This brings us to consider the second phase of this case. Was Johnson acting within the scope of his employment at the time of the accident which resulted in the death of the plaintiff's son? From the testimony of Johnson it appeared that on the occasion of the accident he was using an automobile which had been furnished to him by the company for use in connection with the sale by him of automobiles for the company; that at the time he was going to call on a prospect to whom he was trying to sell a new automobile; that this prospect had previously been in contact with him with reference to purchasing an automobile, and had gone by the company office and informed the manager that he wished to see Johnson; that the manager so informed Johnson, and directed him to call on this prospect; that this was about 6 p. m.; that Johnson would be unable to see this prospect before 7:30 that evening; *that Johnson went first by a café where his wife worked, and ate supper, and was on his way from that place to call on this prospect when the accident occurred;* and that on the day of the accident this prospect had visited the office of the company and had told the manager to have Johnson 'come up to see me at the store that night.' The manager of the company testified, that this prospect came by the company office about five o'clock the evening of the accident, and stated that Johnson had been calling on him with the idea of selling an automobile to him; that when John-

son later came to the office the witness directed him to call on this prospect; and that Johnson stated that 'he would as soon as he got supper.' *There was evidence to the effect that the place where the accident occurred, at about 7 p. m., was along a route which Johnson would necessarily travel from the café, where he had eaten supper, to the place where the prospect was."* (Italics ours.)

The former decision does not require, as contended by the plaintiff in error, a ruling that the case should have been submitted to the jury on the last trial, because the facts as to Johnson's movements shortly before the homicide were quite different from those on which this court based its ruling on its first appearance here and which were referred to in the language which we have italicized above. It appears from the evidence and admissions of the plaintiff in error, as to the scene of the homicide, that in Rome, Georgia, Broad Street runs north and south; that Fourth Avenue, Fifth Avenue, and Sixth Avenue run east and west across Broad Street, Fifth Avenue and Sixth Avenue being north of Fourth Avenue; that Sterchi's, where the prospect of Johnson worked, is located at the northwest corner of Broad Street and Fourth Avenue; that Partridge's Café, at which the wife of Johnson worked, is on Broad Street, on the west side, and about a half block from the northwest corner of Broad Street and Fifth Avenue; that one in driving up Broad Street from Fourth Avenue, desiring to park in front of the café, was required by traffic regulations to refrain from making a U-turn until reaching Sixth Avenue. Johnson usually ate supper at Partridge's Café. With respect to his movements after being told by the general manager of the motor company to get in touch with his prospect, Hardin, and being answered by Johnson that he would see him after supper, Johnson testified on the last trial: "This accident happened around a quarter to seven, Friday afternoon. I was going to the Partridge Café, when it happened, for the purpose of eating supper. I knew that Mr. Hardin was looking for me and expected to see me that night. I found out from Mr. Griffin. Mr. Griffin was a salesman with G. L. Hight Motor Company. I knew that I couldn't see Mr. Hardin until nine o'clock that night. I knew that I couldn't see him until that time because I had worked there at one time for about two years and I knew they had a meeting that night and I couldn't see him until after that meeting. I didn't eat my supper. The Partridge Café

is located between Fifth and Sixth Avenues on Broad Street about five doors up from the National City Bank. In order to go to the Partridge Café you have to go up to Sixth Avenue before you can make a U-turn. I had already gone past Sterchi's when the accident happened. I had passed Sterchi's when the accident happened. . . When I left the place of business on this particular night I was not going to see a customer, but was going to eat supper. I was to see Mr. Hardin later, around 9 or 9:15 that night. . . The Partridge Café is about a block and a half from Sterchi's on Broad Street. Sterchi's is on the corner of Fourth Avenue and Broad, and the Partridge Café is between Fifth and Sixth Avenues on Broad Street, about half way up the block on the left. . . The nearest place that I would have made a U-turn after I turned up Broad Street was at Sixth Avenue. To park in front of Sterchi's, when I was going north, I would have had to go to Sixth Avenue and make a U-turn and come back. I could have circled around the block without violating the law. I was going to see Mr. Hardin after I left the café around 9 o'clock. . . I was not expecting to see Mr. Hardin at the café that night. He did take his meals there, but I did not expect to see him there that night for I knew he had the sales meeting to go to. I did say he took his meals there at times, but not on week-ends. You can't catch a man around a café on week-ends. . . When I came from the place of business that night I came up Second Street to Fourth Avenue, down Fourth Avenue to Broad Street right opposite the Sterchi store. I would have parked there then had I been going to the Sterchi store. I do generally take my meals at the Partridge Café."

It is well established that where a servant causes an injury to another, it is not that the act is within the *period of employment* that determines that the master is liable, but the test is whether or not the servant was *at the time of the injury* acting within the scope of his employment and on the business of the master. There was not on the last trial of the case evidence, as on the first hearing, from which a jury could reasonably find that at the time of the homicide here involved Johnson went to the Partridge Café, ate supper, and "was on his way from that place to call on this prospect when the accident occurred" or that "the place where the accident occurred, at about 7 p. m., was along a route which John-

son would necessarily travel from the café, where he had eaten supper, to the place where the prospect was." Johnson never went from the café to see Hardin. He never reached the café. In his progress up Broad Street he was leaving the vicinity of Sterchi's. He was not leaving the vicinity of Partridge's Café, but was approaching it. It appears that he had no intention of seeing his prospect until about 9 o'clock at night; that when the homicide occurred at about 6:45 p. m. he was not endeavoring to reach him, but was en route to the café to eat supper, and was not expecting the prospect to be there. His testimony shows, without contradiction, that in proceeding up Broad Street he was on his own mission, and that after supper he would begin, for the first time, the act of proceeding around 9 o'clock toward Hardin's place of employment, intending to confer with him there at the conclusion of a sales meeting. Johnson drove from Second Street, east of Broad Street, turned westwardly into Fourth Avenue, and then turned to the right into Broad Street. If he had been en route to Sterchi's, he would not have found it necessary to turn to the right and into Broad Street and proceed two blocks to make a U-turn and come back to Sterchi's, because on Fourth Avenue he was in the act of approaching Sterchi's and, as he testified, could readily have parked there if he had desired to see Hardin at that time. His plain purpose in turning into Broad Street, as his testimony shows, was to proceed to Sixth Avenue, make a U-turn, and come back on Broad to the Partridge Café with the intention, as was his nightly custom, of eating supper there. The mere fact that he intended to visit Hardin about two hours later could not reasonably authorize a finding that in going from the vicinity of Sterchi's to eat supper at the café, at his own expense, he was at that time on business for the automobile company. Assuming but not deciding that he was ordinarily the servant of the company, and not an independent contractor, in the sale of automobiles on commission, a finding is demanded as a matter of law that at the time of the homicide Johnson was engaged in a purely personal enterprise, entirely disconnected from any business of the G. L. Hight Motor Company. Accordingly, the trial court did not err in granting a nonsuit as to the automobile company.

*Judgment affirmed. Felton, J., concurs.*

STEPHENS, P. J., dissenting. I can not concur in the conclu-

sion that at the time of the accident Johnson, for the reasons stated in the opinion of the court, was not on the business of the motor company. It is inferable from the evidence that when Johnson left the place of business of the motor company, in the automobile, his intention was, after stopping at the café, to proceed and make a contact with Hardin, the prospective purchaser of an automobile from the motor company. The mere fact that Johnson intended to stop at the café, even though proceeding to the café entailed a territorial deviation from the direct route to Hardin, does not demand a finding that Johnson, while on the way to the café, had deviated from his employer's business and was on business of his own. The evidence authorized the finding that Johnson was a servant of the motor company, and that when going to the café in the car he was about the master's business. The evidence was sufficient to authorize a finding that the accident, which happened by Johnson's running over the plaintiff's son while Johnson was on the way to the café, was caused by the negligence of the motor company through and by its servant or agent Johnson. I am of the opinion that the court erred in granting a nonsuit.